Filed 2/14/25  P. v. Newton CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAY ANTHONY NEWTON,<br><br>    Defendant and Appellant. | D084096<br><br><br>(Super. Ct. No. SCN439080) |

APPEAL from an order of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Richard J. Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ray Anthony Newton appeals from the trial court's order denying his petition for pretrial mental health diversion (Petition) under

Penal Code[1] section 1001.36. The court denied the Petition based on its finding that the circumstances of the charged offenses demonstrated Newton posed an unreasonable risk of danger to public safety.

Newton on appeal contends the trial court's finding is not supported by substantial evidence and requests that we grant his Petition. Because substantial evidence supports the court's dangerousness finding, we affirm the order denying Newton mental health diversion.

## FACTUAL AND PROCEDURAL BACKGROUND

Newton and his estranged wife Pearline M. married in 2012. They had one child together, daughter A.N., who, at the time of the November 2022 incident, was 10 years old. Pearline also has a 21-year-old daughter, K.T.

### A. *Circumstances Involving the Charged Offenses*

On November 22, while out on bail and in violation of a criminal protective order in favor of Pearline and her two daughters, Newton went to Pearline's Oceanside home at about 4:00 a.m. Although K.T. and A.N. were asleep in their upstairs bedrooms, Pearline was awake in her downstairs bedroom, after having just received a call and a text message from Newton's cousin warning her about Newton. About an hour earlier, Newton had messaged his cousin that "he felt like killing" and said he was "going to go to [Pearline's] house and burn the house down."

A few minutes later, Pearline heard her garage door open. Concerned, she went into the living room and saw Newton standing inside the home "wearing a ski mask" and holding what she described as a "mallet." Newton accused Pearline of "talking stuff," then chased her into the bedroom, got on top of her, and repeatedly swung the mallet at her, striking her in the head about three times.

---

[1] All further statutory references are to the Penal Code.

Awakened by their mother's cries for help, K.T. and A.N. ran to Pearline's bedroom and found Newton on top of her with his hands around her neck. Newton yelled to Pearline something to the effect of "I'm going to kill you" and "why the 'F' are you up at 4:00 a.m." He next pushed K.T. to the floor and A.N. against the wall, as the girls attempted to stop him. Pearline grabbed the mallet from Newton and she and the girls ran outside. Pearline hid behind a pickup truck and called 911, whispering to the dispatcher because Newton was still looking for her. Before Newton left the area, Pearline saw him pick up K.T., put her over his shoulder, and slam her to the ground, injuring K.T.'s knee.

Officers responded to the scene and saw Pearline had a "large hematoma on her face." They searched two bags inside Pearline's garage that had not been present beforehand. In one of the bags they found "a gas can with gas in it and a torch." In the other they found items belonging to Newton, as well as a set of keys and a garage door opener. A short while later, officers arrested Newton in a neighbor's yard.

An ambulance transported Pearline to the hospital. She had three "lumps" on her head from the attack; and was diagnosed with "[t]raumatic brain injury" and long- and short-term memory loss. As a result of the attack, she is no longer able to work.

An information charged Newton with 10 counts, including attempted murder (§§ 187, subd. (a) & 664); assault with a deadly weapon (§ 245, subd. (a)(1)); corporal injury on a spouse (§ 273.5, subd. (a)); first degree burglary (§§ 459 & 460); and violation of a criminal protective order (§ 166, subd. (c)(1)).

3

**B.** *Diversion Hearing*

Newton filed his Petition in September 2023. At the November 2023 hearing, Newton's former business partner testified that over about a 10-year period, he never saw Newton "overdrink," abuse drugs, or exhibit any type of violent behavior.

A neuropsychologist also testified on Newton's behalf. In preparation for her report, the neuropsychologist evaluated Newton over a two-day period in June 2023 and reviewed police reports and Newton's medical records. The neuropsychologist opined that in 2020 Newton suffered traumatic brain injury from a skateboarding accident, and another brain injury in 2021; that as a result he began to self-medicate with alcohol and cocaine; and that his condition constituted a qualifying mental disorder which played a significant role in the commission of the charged offenses.

The neuropsychologist further opined that if Newton maintained his sobriety and engaged in substance abuse treatment, he was not a danger to public safety because his brain injury had stabilized, he allegedly had no prior history of violence before this incident, he expressed remorse for what he had done, and he welcomed treatment for his mental health condition.

The prosecutor argued Newton had been charged with a "super strike offense"—attempted murder—and was likely to commit such an offense in the future. The prosecutor noted that in the current offense Newton committed "an intentional planned act," as he told his cousin beforehand what he intended to do then carried out part of that plan by attempting to kill Pearline. The prosecutor added that Newton committed these offenses despite the existence of a criminal protective order protecting Pearline and her two daughters, which had issued after he became violent during a September 2022 family incident. The prosecutor asked the trial court to deny

4

diversion because Newton posed an extreme danger not only to the general public but also to his family members.

## C. *The Trial Court's Ruling*

The trial court found Newton had a qualifying mental disorder and, with the recent changes in the law, that the disorder was a significant factor in the commission of the charged offenses.  The court, however, ruled Newton ineligible for diversion because he posed an unreasonable risk of danger to public safety.  The court noted the November 22 incident was not the result of "sudden impulse," but instead showed planning activity by Newton and a motive for the attack, as he did not want his estranged wife "to walk away with everything" in a divorce.

The trial court found it was "misleading" to call the instrument Newton used to attack Pearline a "mallet" or "hammer," as it was more like a "small sledgehammer" which bore the stamp "three pounds" in its "solid metal head."  The court noted Pearline was "lucky" to have survived the attack; and that it was a "fair inference" that had Pearline not been forewarned by Newton's cousin, Newton would have carried out his plan "to burn the house down while the victim and the children slept."

The trial court was also concerned about a statement in the neuropsychologist's report in which Newton claimed he merely took the gasoline and blow torch to Pearline's home "so he could drag the bed outside and burn it."  The court noted that statement "directly contradicted what he told his cousin that evening, that he was going to burn the house down and he didn't give a f*** about the kids that were in it."  The court also noted that Newton was "less than truthful" with the neuropsychologist in failing to acknowledge that he struck his estranged wife with a small sledgehammer and his claim he did not remember "strangling her."

5

The trial court was also "troubl[ed]" by Newton's statement that he hoped the family could "reunify." The court noted that, in its experience, when an individual is accused of committing "domestic violence, especially very violent domestic violence," if the desire to reunify is "unfulfilled" that could lead "to greater domestic violence," adding that in the instant case "we already have had charges, conduct that appears to be attempt[ed] murder."

## DISCUSSION

### A. *Statutory Framework*

Pretrial mental health diversion under section 1001.36 authorizes the "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ." (§ 1001.36, subd. (f)(1).) To qualify, the defendant must be both eligible and suitable for diversion. A defendant is eligible for diversion if two criteria are met: (1) the defendant has been diagnosed with a qualifying mental disorder, and (2) the mental disorder "was a significant factor in the commission of the charged offense." (*Id.*, subd. (b)(1) & (2); *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891 (*Sarmiento*).) If the defendant meets the two enumerated eligibility requirements, "the court must consider whether the defendant is suitable for pretrial diversion." (§ 1001.36, subd. (c).)

" 'A defendant is suitable for pretrial diversion if all of the following criteria are met:' (1) 'In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment'; (2) 'The defendant consents to diversion and waives the defendant's right to a speedy trial'; (3) 'The defendant agrees to comply with treatment as a

6

condition of diversion'; and (4) 'The defendant will not pose an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community.' " (*People v. Brown* (2024) 101 Cal.App.5th 113, 120 (*Brown*), quoting § 1001.36, subd. (c).) "Only the fourth requirement necessitates a trial court finding—that the defendant 'will not pose an unreasonable risk of danger to public safety . . . if treated in the community.' " (*Sarmiento, supra*, 98 Cal.App.5th at p. 892, quoting § 1001.36, subd. (c)(4).)

As used in section 1001.36, subdivision (c)(4), " 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of [section 667, subdivision (e)(2)(C)(iv)]." (§ 1170.18, subd. (c).) Section 667, subdivision (e)(2)(C)(iv), in turn, lists categories of super strike felonies, including, as relevant here, any homicide offense. (§ 667, subd. (e)(2)(C)(iv); see *People v. Moine* (2021) 62 Cal.App.5th 440, 450 ["risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies"].)

## B. *Standard of Review*

On appeal, we review a trial court's decision whether to grant mental health diversion for abuse of discretion. (*Brown, supra*, 101 Cal.App.5th at p. 121.) "The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 (*Haraguchi*).)

In conducting substantial evidence review, we view the record in the light most favorable to the trial court's order. (*Haraguchi, supra*, 43 Cal.4th at pp. 711–712.) We must uphold the court's order "if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such

evidence is found, the substantial evidence test is satisfied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

## C. *Analysis*

Newton contends the trial court abused its discretion in denying his Petition because the record evidence is insufficient to support the finding he posed an unreasonable risk of danger to public safety—that he was likely to commit a super strike. We disagree.

Section 1001.36, subdivision (c)(4) expressly permits the trial court to "consider the opinions of the district attorney, the defense, or a qualified mental health expert, and . . . the defendant's treatment plan, the defendant's *violence* and *criminal history*, *the current charged offense*, and any other factors that the court deems appropriate" in exercising its discretion whether to grant diversion. (§ 1001.36, subd. (c)(4), italics added.)

Our case of *People v. Bunas* (2022) 79 Cal.App.5th 840 (*Bunas*) provides meaningful guidance here. In *Bunas*, the trial court found the defendant unsuitable for diversion *solely* because of the circumstances of the defendant's commission of the charged offense—corporal injury of a spouse. (*Id.* at p. 861.) The trial court found the defendant's attack of his domestic partner was unprovoked and violent, as he repeatedly struck her in the head—first with a large flashlight, and later with a knife or machete—while telling her he wanted to kill her, most of which took place in front of their nine-year-old child. (*Id.* at pp. 850–851.) On appeal, the defendant argued the court erred in relying solely on the circumstances of the attack to deny his request for diversion. (*Id.* at p. 861.)

In rejecting the defendant's argument, we noted section 1001.36 "specifies" that in determining eligibility for diversion the trial court may consider a defendant's "violence and criminal history," as well as the current

8

charged offense or offenses among other factors. (*Bunas, supra*, 79 Cal.App.5th at p. 862.) We further noted there was nothing in section 1001.36, "with respect to either eligibility or suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion." (*Ibid.*)

Similar to the facts in *Bunas*, the circumstances of the charged offenses in the instant case, which includes the super strike of attempted murder, show Newton's attack against his estranged wife was unprovoked and involved severe domestic violence. As summarized above, Newton messaged his cousin at about 3:00 a.m. that "he felt like killing." He also told his cousin he intended to burn down Pearline's home and "didn't give a 'F' " if her daughters were inside.

About an hour later, Newton went to Pearline's home armed with a small sledgehammer, a can of gasoline, and a blow torch. In violation of the criminal restraining order, he entered the home and attacked his estranged wife with the sledgehammer, causing her to suffer traumatic brain injury. During the attack he told Pearline he wanted to kill her, and after she and her two daughters ran outside, he continued to hunt for Pearline, forcing her to whisper to the 911 dispatcher. The circumstances also show planning activity, as evidenced by the ski mask he wore to prevent detection, the early morning hour when he entered the home thinking everyone would be asleep, and his statement during the attack of "why the 'F' are you up at 4:00 a.m."

In addition, the record shows that Newton had a history of violence against Pearline. (See § 1001.36, subd. (c)(4).) A few months before the charged offenses, Newton went to her home while appearing to be under the influence. At some point he demanded to see her cellphone. When Pearline

9

refused, Newton began throwing and damaging items inside the home, then pushed her down and held her on the ground. After she escaped, and as she and her two daughters were leaving the home, K.T. heard a "clicking sound" and saw Newton holding a "black gun" in his hand, sliding the top portion of it back and forth. After returning home later that night, they found ammunition on the ground near the front door. In response to this incident, the trial court issued a criminal protective order protecting Pearline and her two daughters.

That Newton wanted to reunify with Pearline further supports the trial court's finding that if diverted, Newton posed an unreasonable risk of danger to public safety. The court noted that in extreme domestic violence cases such as occurred here, if reunification does *not* occur—which the court found was very likely—that could lead to future domestic violence, or worse, as Newton already was facing a charge of attempted murder.

Finally, we note that much of Newton's argument on appeal is simply a request of us to reweigh the evidence and make a different finding from the one made by the trial court regarding his danger to the public. This we cannot do. (See *People v. Helzer* (2024) 15 Cal.5th 622, 646 [" 'In reviewing factual determinations for substantial evidence, a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.] The determinations should "be upheld if . . . supported by substantial evidence, *even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.*" ' "] (Italics added.)].)

In sum, the circumstances of the charged offenses, including the super strike of attempted murder, as well as Newton's past history of violence against his estranged wife, his lack of candor during the expert interview,

10

and his desire to reunify with Pearline—despite engaging in severe domestic violence, amply support the trial court's finding that, if diverted, Newton posed an unreasonable risk of danger to the public. (§§ 1001.36, subd. (c)(4); 1170.18, subd. (c).) As a result of this finding, the court properly exercised its discretion in denying the Petition. (See *Haraguchi, supra*, 43 Cal.4th at pp. 711–712.)

## DISPOSITION

The order denying Newton's request for pretrial mental health diversion is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

11